# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

---------------------------------X

| | |
|---|---|
| In re | Chapter 7 |
| Ryan M. Johnson and Angela Lee Johnson, | Case No. 22-11548-CJF |
| Debtors. | |

---------------------------------X

JONAH HEYERHOLM,
801 Saint John Street
Cottage Grove, Wisconsin 53527

RITA HEYERHOLM,
801 Saint John Street
Cottage Grove, Wisconsin 53527

JOHN HEYERHOLM,
801 Saint John Street
Cottage Grove, Wisconsin 53527

       Plaintiffs,

v.

RYAN and ANGELA JOHNSON
Husband and Wife
4593 Conestoga Trail
Cottage Grove, Wisconsin 53527
       Defendants.

Adv. Pro. No. 22-00049

---------------------------------X

## PLAINTIFFS' POST-REMAND BRIEF

### PRELIMINARY STATEMENT

    Plaintiffs Jonah Heyerholm, Rita Heyerholm, and John Heyerholm submit this memorandum of law to address the issues raised by this court at the post-remand status conference. Reviewing the facts in

light of the applicable law demonstrates that the conduct of Defendants Ryan Johnson and Angela Johnson is not dischargeable under 11 U.S.C. § 523(a)(6). The court should so declare.

## ARGUMENT

### I. This court has already concluded that the injury was willful, which meets the standard requiring an intentional tort.

11 U.S.C. § 523(a)(6) provides that a debt is nondischargeable if it was incurred through "willful and malicious" injury by the debtor. After hearing the evidence, this court concluded that the debtors willfully caused Jonah Heyerholm's injury, a conclusion affirmed by the district court. (Decision at 11.) On remand, the only issue for the court to consider is whether they were "malicious." Maliciousness requires that the debtor acted "in conscious disregard of [his] duties or without just cause or excuse…" *First Weber Grp., Inc. v. Horsfall,* 738 F.3d 767, 774 (7th Cir. 2013).

In response, this court has asked the parties to address the nature of the duty the debtors consciously disregarded, particularly, whether they breached the ordinary standard of care. Plaintiffs contend that that is no longer an issue. This court's conclusion, affirmed by the district court, that the injury was willful and thus meets the requirement of an intentional tort as required by *In re Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), is now the law of the case. *See .e.g., United States v. Mazak,* 789 F.2d 580, 581 (7th Cir. 1986) (issue decided on appeal is law of the case on remand).

In *Geiger*, an injured patient argued that her physician's malpractice should not be dischargeable in bankruptcy. The United States Supreme Court's decision hinged on the statutory language which declares that "'willful and malicious injury by the debtor to another entity or to the property of another entity'" is not dischargeable. *Id.*, at 61, quoting § 523(a)(6). The court explained: "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Id.* (emphasis in original.) Thus, the focus must be on whether the debtor "intentionally" caused injury. *Id*. The court concluded "that debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Id.*, at 64.

As the district court pointed out, *Geiger* focused on the meaning of "willful" injury, not on the meaning of malicious. (Decision at 10.) The only issue before this court is whether the conduct of the debtors qualifies as malicious.

Because parties can deny that they intended to cause injury, the Seventh Circuit's test for willfulness encompasses not only intended injury but injury which is substantially certain to occur. *Horsfall*, 738 F.3d at 775. In contrast, maliciousness does not require an intent to injure. Instead, it "requires that the debtor acted 'in conscious disregard of [his] duties or without just cause or excuse; it does not require ill-will or specific intent to do harm.'" *Horsfall*, 738 F.3d at 774, *quoting In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994)).[1] Thus, the definition of malicious encompasses harm that is not specifically intended; it contemplates rights which are consciously disregarded as well as actions that are without justification or privilege. *Id*. Importantly, the Seventh Circuit's definition does not conflict with the U.S. Supreme Court's definition of that term. *See* District Court Decision, p. 10.

Nonetheless, confusion may arise due to the definition of malice as a conscious disregard of duties. Generally, courts have concluded that some form of tortious conduct is required for a claim to be nondischargeable. *In re Snyder,* 542 B.R. 429, 443 (N.D. Ill. 2015). *Snyder* rejected the argument that a breach of contract was dischargeable under § 523(a)(6); the court held that "the terms 'duties' and 'excuse' used in *Horsfall'*s analysis of Section 523(a)(6) must be interpreted in the tort sense rather than the contract sense." *Id*., at 441. *Snyder* then quoted the *Restatement (Second) of Torts* §4, to explain the difference between contract and tort duties. *Id*., at 442. As to tort duties, *Snyder* states:

> [T]he duty in tort is only occasionally to do or refrain from doing a particular thing, and even then the doing or non-doing of the thing is not the end or the purpose of the duty itself. It is merely a means whereby the interest protected by the duty can be made secure. Therefore, the harm which the duty is intended to prevent does not occur until the interest

---

[1] In *Horsfall*, the Seventh Circuit expressly considered whether its definition of "malicious" remained good law after *Geiger* and concluded it did. "Understanding that the definition of willfulness must incorporate *Geiger's* admonition that the requisite intent for purposes of § 523(a)(6) is the intent to injure rather than the intent to act, we reaffirm today that our definition of maliciousness from *Thirtyacre* remains good law." *Id*., at 774-775.

protected by it is invaded and, therefore, until such invasion occurs there can be no liability for the breach.

*Id., quoting Restatement (Second) of Torts* § 4 cmt. c (1965).

*Snyder's* analysis is spot on. Only when the interest is invaded can the nature of the "duty" (negligent, reckless, or intentional) be determined because it is the conduct causing the injury which determines the standard. Thus, duty is defined broadly by the Restatement:

> **The word "duty" is used throughout the Restatement of this Subject to denote the fact that the actor is required to conduct himself in a particular manner at the risk that if he does not do so he becomes subject to liability to another to whom the duty is owed for any injury sustained by such other, of which that actor's conduct is a legal cause.**

*Restatement (Second) of Torts* § 4.

Critical here, Comment b explains that the term "duty," is generally used to refer to negligence cases, not intentional torts:

> The word "duty" is used most frequently in that part of the Restatement of this Subject which deals with the subject of Negligence. This usage conforms to that of courts in dealing with negligence problems. It is particularly valuable in describing the requirement that action shall be taken for the protection of the interests of others. It is also useful to describe the requirement that the actor, if he acts at all, must exercise reasonable care to make his acts safe for others. *"Duty" is rarely used in dealing with the invasions of legally protected interests by acts which are intended to invade them.*

*Id.*, cmt. b (emphasis added).

Because the typical use of the term "duty" is in negligence cases, defining "malice" in terms of disregard of duties necessarily calls to mind negligence cases.[2] However, the breadth of the *Restatement* definition demonstrates that duty is broader than mere negligence, referring to the actor's obligation "to conduct himself in a particular manner…" Ultimately, it is the nature of the tortfeasor's conduct which determines which "duty" applies. For example, one can fail to exercise ordinary care in operating an

---

[2] This is particularly true in Wisconsin, which is defines duty more broadly than most other states because it adopted the minority viewpoint from *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928). *Rockweit v. Senecal*, 197 Wis.2d 409, 419-420, 541 N.W.2d 742 (1995). In Wisconsin, "[e]ach individual is held, at the very least, to a standard of ordinary care in all activities." *Id.*, at 419 (internal quotation omitted).

4

automobile and thus negligently cause a collision resulting in injuries. That violates the duty to exercise ordinary care. However, a person could also intentionally collide with an object in order to cause injuries. A person has a duty to refrain from such acts but as the *Restatement* explains, those cases generally do not discuss "duty" but instead describe the type of conduct which results in liability. *See, e.g.,* Restatement (Second) of Torts § 18 (defining battery.).

In this case, the debtors had a duty to exercise ordinary care in maintenance and operation of their boat and also in supervising their minor guests. Their decision not to have a mechanic repair their boat was a deliberate choice, one they repeated each time the boat malfunctioned. In addition, they chose to invite guests and operate the boat knowing that it had a malfunctioning transmission that they had chosen not to repair. Worse, Ryan Johnson chose to not only leave the engine on but to engage the transmission because he thought the boat was too close to Jonah, an act contrary to boater safety rules which require engines to be off when attempting to pick up a swimmer. (*See* Dkt. 44, p. 40 ("The second bullet point under the Safe Boating Practices provides, 'Make sure the engine is off so that the propeller is not rotating when passengers are boarding or leaving the boat.' Did I read that correctly? A. Correct.")

Because this court correctly concluded that the debtors' conduct was willful, their conduct qualifies as an intentional tort. Their deliberate choices, made despite knowing the likelihood for severe harm to someone nearby in the water caused by an engaged propellor, meets the definition of both willful and malicious.

**II.     The Debtors' conduct was malicious.**

In *Horsfall*, the Seventh Circuit considered whether a state court judgment qualified as issue preclusion as to willful and malicious injury. The court held that the state court's conclusion that Horsfall tortiously interfered with a contract substantially mirrored the definition of "malicious" such that issue preclusion applied, explaining:

> The state court thus determined that Horsfall's interference was intentional and that he was neither justified nor privileged to interfere with First Weber's rights. In order to reach this conclusion, the state court had to find that Horsfall's actions were not reasonable or taken in good faith. This inquiry substantially mirrored the federal test for maliciousness.

*Id.*, at 775.

Other courts have applied a similar definition. For example, in *n re Kozlik*, No. 12-29545-SVK, 2013 WL 28708, at *3 (Bankr. E.D. Wis. Jan. 2, 2013), the debtors had granted an easement to the plaintiffs but began harassing the plaintiffs when they used the easement. After concluding that the state court judgment met the requirements for being willful, the court declared that it also qualified as malicious, explaining:

> By granting the Creditors' request for an injunction against the Debtors, Judge Conley necessarily found that that the Debtors had no just cause or excuse for their conduct. Therefore, the court in the Oconto County action considered and found the requisite elements of malice, and the Debtors should be precluded from claiming that they are not bound by Judge Conley's findings in this adversary proceeding.

*In re Kozlik*, No. 12-29545-SVK, 2013 WL 28708, at *3 (Bankr. E.D. Wis. Jan. 2, 2013).

While not an exact reflection, Wisconsin's test for punitive damages also substantially mirrors *Horsfall's* test for "malicious" injury. Punitive damages may be awarded when a plaintiff shows that a defendant "acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." Wis. Stat. § 895.043(3). As with malicious injury under § 523(a)(6), proving the intentional disregard of rights does not require evidence that a defendant "inten[ded] to cause injury to the plaintiff." *Strenke v. Hogner*, 2005 WI 25, ¶ 19, 279 Wis.2d 52, 694 N.W.2d 296 (internal quotation omitted). Rather, the word "intentional" in the statute is used to "describe the heightened state of mind required of the defendant who disregards rights, instead of the common law's description of 'wanton, willful and reckless.'" *Id.* In other words, there is "no requirement of intent to injure or cause harm" to award punitive damages. *Wischer v. Mitsubishi Heavy Indus. Am., Inc.*, 2005 WI 26, ¶ 24, 279 Wis.2d 4, 694 N.W.2d 320.

*Strenke* and *Wischer* illustrate the type of conduct that consciously disregards the rights of others. In *Strenke*, the defendant's acts of drinking 16-18 beers, then driving while intoxicated, were deliberate. 279 Wis.2d 52, ¶ 55. Those acts (drinking and driving) disregarded the rights of all other motorists to safely use the highway. *Id.*, ¶ 56. The defendant had four prior convictions for driving while intoxicated. *Id.*, ¶ 57. Thus, his actions were sufficient to prove an intentional disregard of the rights of others and thus warrant imposition of punitive damages. *Id.*, ¶ 58.

*Wischer* involved a construction accident, when a crane collapsed in high winds, killing three workers. The Wisconsin Supreme Court declared that the defendants' actions, including using the crane in high winds, failing to make wind-speed calculations, and exceeding the crane's load chart limitations were sufficient to warrant submission of punitive damages to the jury. *Wischer*, 279 Wis.2d 4, ¶ 8. Evidence supporting the court's conclusion included:

- The load chart specified that the maximum safe wind speed was 20 m.p.h. but experts testified that as the load increased, the maximum safe wind speed decreased. *Id*., ¶ 38-39;
- Evidence of wind speeds of 20 m.p.h. with gusts up to 26 m.p.h.;
- Evidence that defendants were aware of the dangers of high wind speeds during a lift;
- An admission that defendants did not calculate wind speeds for any of the crane's lifts. *Id*., ¶¶ 38-52.

The court concluded that these facts were sufficient to demonstrate a conscious disregard of the workers' rights to safety and therefore supported submitting the question of punitive damages to the jury. *Id*., ¶58.

The facts here are akin to those in *Horsfall, Kozlik*, *Strenke* and *Wischer*, and similarly demonstrate conscious disregard of rights. The Johnsons were experienced boat owners; Mr. Johnson was an engineer. The Johnsons' pretrial admissions indicated that their boat had transmission problems from the time of its purchase, but the Johnsons chose not to take the boat to a mechanic for repair. Instead, Mr. Johnson attempted repairs himself, but the issues continued. The evidence regarding those issues is set forth in the Appellants' Brief at 11-15; 29-40 and their Reply Brief at 5-12.

Although the Johnsons minimized the transmission issues at trial, Mr. Johnson admitted that the boat occasionally remained in gear. (Dkt. 44, p. 51-52.) They also admitted that in the Joint Pretrial Report. (Dkt. 14, p. 14.)

In their Answer, the Johnsons admitted that Ryan Johnson backed the boat toward Jonah to pick him up. (Dkt. 12, p. 2.) At trial, the Johnsons testified that Mr. Johnson put the boat in neutral as he approached Jonah, but the boat continued to drift toward Jonah. (Dkt. 44, p. 54, 68.) Mr. Johnson put the boat

in "forward" to drive away from Jonah but claimed that the transmission went into reverse. (Dkt. 44, p.68.) The only reasonable inference from all of this testimony was that, as the Johnsons told Jonah and investigating officers immediately after the accident, the boat transmission had stuck in gear again, this time stuck in reverse, with disastrous results.

This court found the Johnsons' testimony minimizing the transmission problems not credible. (See Appellant's Brief at 14-15, 19-20; Reply Brief at 5-7.) However, the court accepted the Johnsons' testimony that that the particular issue that caused Jonah's injuries, that the boat was put in forward but went in reverse, was a new problem. (Dkt.44, p. 125-126.) That conclusion does not square with the Johnsons' admissions that the boat was stuck in gear, as had occurred before.

When an equipment problem recurs but the owner chooses not to address it, the harm that ultimately results is no accident (explained in more detail in Appellants' brief at 26-27, 29-40). Coupled with the grave danger of propeller injuries, a danger well-known to experienced boaters like the Johnsons, the conclusion that the Johnsons consciously disregarded their duties to not harm their passengers is inescapable.

Wisconsin's Boater Safety Handbook sets forth a section warning about the dangers of propeller strikes and declaring that the boat *engine* should be off, so the propeller is not rotating when picking up passengers. (Dkt. 44, p. 40; see also Ex. 11, p. 30.) Passengers in the water are in a particularly helpless position. They cannot swim or dive away in time to avoid injury when a powered boat is oncoming. The Johnsons knew of this danger and of the boat's recurring transmission problems. Despite this knowledge, they chose to use the boat as often as possible for sports such as wakeboarding, which required that the wakeboarders be picked up from the water when finished with their run. Although operator Ryan Johnson knew that the engine should be off when picking up swimmers, he not only left the engine on, he deliberately switched the transmission into gear while attempting to pick up Jonah, at a time when he knew the boat was dangerously close to Jonah. (See Appellants' Brief 11-14; 29-40; Reply Brief at 5-12.) Given the recurrent transmission problems, these decisions consciously disregarded Jonah's right to safety.

Further, the Johnsons chose not to insure their faulty boat and failed to warn their guests about the defects with the boat's transmission or the lack of insurance. These deliberate choices also left passengers, including the Johnsons' own children, open to grave risk without knowledge of the lack of potential compensation for resultant injuries.

While this court expressed some doubt that the Johnsons were conscious of the gravity of the risk as their own children also took part in wakeboarding, this statement appears based on the conclusion that the particular transmission issue (going into reverse when put into forward) was a new one. But in reality, it is just a new way to describe the problem the Johnson admitted existed—the transmission stuck in gear.

As explained in more detail in the appellate briefs, the Johnsons initially admitted to both Jonah Heyerholm and investigating officer Jepson that it was the recurrent problem, the transmission sticking in gear, that caused the injuries. Because the Johnsons were aware that the transmission sometimes stuck in gear, it was more important that they turn the engine off when picking up Jonah. Mr. Johnson not only left the engine on, he engaged the faulty transmission—which remained stuck in reverse. As in *Wischer*, the Johnsons were essentially playing Russian Roulette with their passengers' lives when picking them up in the water. *See Wischer*, 279 Wis.2d 4, ¶ 44. This is conscious disregard of duty.

> In determining whether an actor behaved maliciously, courts will take into account the totality of the circumstances. *Vyshedsky v. Soliman (In re Soliman)*, 539 B.R. 692, 699 (Bankr. S.D.N.Y. 2015). "Malice is implied when 'anyone of reasonable intelligence knows that the act in question is contrary to commonly accepted duties in the ordinary relationships among people, and injurious to another.'" *Id.* (quoting *Navistar Fin. Corp. v. Stelluti (In re Stelluti)*, 167 B.R. 29, 33 (Bankr. S.D.N.Y. 1994), aff'd, 94 F.3d 84 (2d Cir. 1996)).

*In re Rodriguez*, No. 17-10782-7, 2018 WL 671137, at *2 (Bankr. W.D. Wis. Jan. 31, 2018). The Johnsons knew their boat transmission was defective and sometimes stuck in gear; they chose not to repair it. They knew that is was dangerous to engage the transmission when near a swimmer even when the boat's transmission was not defective; they chose to engage their defective transmission anyway. That conduct alone qualifies as malicious. The Johnsons compounded it by failing to warn guests, failing to purchase insurance, and failing to warn guests about the lack of insurance.

### III. The Johnsons' Conduct is Malicious Per the Bankruptcy Code.

This court asked the parties to address whether the Johnsons' "duty" fit under the bankruptcy code. As explained above, the Johnsons had multiple duties. Not only were they required to exercise ordinary care, they had a duty to refrain from willfully injuring others. The latter duty is the one they breached. That duty, as explained in cases like *Snyder*, fits under the bankruptcy code because it involves willful conduct and knowing disregard of their victims' safety.

As explained above, and in Appellants' brief at 26-27, 29-40, deliberate failure to remedy a problem is not an accident. Neither is the harm that results from that misconduct. The tortfeasors self-serving denials of intent to harm must be disregarded because they do not square with the undisputed facts. *See, e.g., N.N. v. Moraine Mut. Ins. Co.*, 153 Wis. 2d 84, 95–96, 450 N.W.2d 445, 450 (1990) (disregarding denial of intent due to intoxication as contrary to the evidence).

### IV. The Seventh Circuit's Analysis is Not Contrary to Geiger.

This court's final query was how maliciousness differed in the U.S. Supreme Court and the Seventh Circuit. The answer is that it does not differ. As explained in footnote 1, above, the Seventh Circuit analyzed its definition of willful and malicious in light of the U.S. Supreme Court's decision in *Geiger* and concluded that its definition remained good law. *Horsfall*, 738 F.3d at 774-775. The district court agreed that the definitions of malicious did not conflict. (Decision at 10.)

While *Geiger* declared that negligent and reckless torts were not dischargeable in bankruptcy, stringently interpreting *Geiger* to require an intentional act as direct as a punch to the face in order to declare tortious conduct nondischargeable would itself be contrary to the Bankruptcy Code. As both the U.S. Supreme Court and the Seventh Circuit have explained, the Bankruptcy Code limits extension of its "fresh start" policy to the "'honest but unfortunate debtor.'" *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 324 (7th Cir. 2012), *quoting Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The Johnsons do not qualify. While their act of not having a mechanic assess their faulty transmission may not seem as transgressive as punching someone, when it was repeated again and again, creating a Russian

Roulette gamble for their unsuspecting guests, it was no longer negligent. It became intentional and thus this court correctly declared it willful. Considering the totality of the circumstances by combining the Johnsons' failure to repair the faulty transmission with their leaving the motor of the faulty boat running, contrary to boater safety rules, when picking up a swimmer; engaging the transmission—known to stick in its last gear—near a helpless swimmer; failing to warn guests about the defective transmission; failing to insure the boat; and failing to warn guests of their lack of insurance on their defective boat, the willfulness and maliciousness of the Johnsons' conduct becomes incontrovertible. The court must declare their debt nondischargeable.

Dated this 11th day of November 2024.

HABUSH HABUSH & ROTTIER S.C.®

*Electronically signed by Jason J. Knutson*
Jason J. Knutson
State Bar No.: 1035801
Breanne L. Snapp
State Bar No.: 1091474

Attorneys for Plaintiffs

150 E. Gilman St. #2000
Madison, WI 53703
(608) 255-6663