UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

*In re*:

RYAN M. JOHNSON and
ANGELA LEE JOHNSON,

     Debtors.

Case Number: 22-11548-7

JONAH HEYERHOLM,
JOHN HEYERHOLM, and
RITA HEYERHOLM

     Plaintiffs,

v.

RYAN M. JOHNSON and
ANGELA LEE JOHNSON

     Defendants.

Adversary Number: 22-00049

## <u>DECISION ON REMAND FROM DISTRICT COURT</u>

John, Rita, and Jonah Heyerholm (together, "Plaintiffs") sued Debtors Ryan and Angela Johnson (together, "Defendants") in an adversary proceeding seeking to have their claim deemed to be nondischargeable as a willful and malicious injury under Code section 523(a)(6). After trial, this Court found the Defendants' conduct during a boating accident involving Jonah Heyerholm was willful but not malicious under section 523(a)(6). Plaintiffs appealed. The district court, while upholding this Court's finding of willfulness, remanded the case for this Court to apply the proper standard of "maliciousness."

The Seventh Circuit says a debtor's act is malicious if the debtor acts with a conscious disregard of duty, or without just cause or excuse. This is

ultimately a question of fact reserved for the trier of fact. *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994).

The parties agreed no further hearing was required on remand. Briefs were ordered on the issue of maliciousness. The parties have completed briefing, and following the guidance of the district court, this Court concludes the conduct was not malicious under the Code.

## PROCEDURAL HISTORY

Defendants filed a voluntary Chapter 7 petition in September 2022. Plaintiffs filed this adversary proceeding that November. The Court held an evidentiary hearing in May 2023. John, Rita, and Jonah Heyerholm testified on their own behalf. Plaintiffs called Officer Cody Jepson as a witness. Ryan Johnson was called to testify for both the Plaintiffs and the defense. Defendant Angela Johnson testified for Defendants.

After the trial, the Court issued an oral ruling for Defendants. Plaintiffs timely appealed. In September 2024, the district court vacated this Court's ruling and remanded the case for further proceedings.[1]

## FACTS

The Court did not issue written findings of fact or conclusions of law after trial. It rendered an oral ruling.

---

[1] *Heyerholm v. Johnson*, No. 23-328, 2024 U.S. Dist. LEXIS 170237, 2024 WL 4240288 (W.D. Wis. Sep. 19, 2024). The decision sustained the ruling on willfulness but reversed and remanded for further proceeding on the question of "malicious" under 11 U.S.C. § 523(a)(6).

The Court has reviewed the pretrial submissions, briefs on remand, and the trial transcript and makes the following findings of fact:

1.  Defendant Ryan Johnson purchased a boat in July 2019, three years before the accident. (ECF No. 44 at 63, lines 15–17).

2.  In the first season of using the boat, Mr. Johnson noticed it seemed to idle at about 950 RPMs instead of about 650 RPMs. (*Id.* at 60, lines 18–20).

3.  The higher RPM did not allow the propellor to fully disengage. (*Id.* at 60, lines 23–25; 61, line 1).

4.  The dwell period resulting from the higher RPM was referred to by Ryan Johnson as "ratcheting in gear." (*Id.* at 61, lines 16–25; 62, lines 1–2).

5.  When the boat would ratchet in gear, the prop would spin but not engage in either forward or reverse. (*Id.* at 62, lines 12–15).

6.  The boat would drift in idle when the engine would ratchet. (*Id.* at 61, lines 19–22).

7.  Mr. Johnson adjusted the idle to correct the issue of ratcheting in gear the first year. (*Id.* at 71, lines 23–25; 72, lines 1–4).

8.  The idle issue was corrected in 2019. (*Id.* at 72, lines 10–15).

9.  After the adjustment to the idle was made, when the boat was in neutral the prop did not spin. (*Id.* at 69, lines 7–9; 74, lines 9–12).

10.  At no time did Mr. Johnson experience the boat getting stuck in gear. (*Id.* at 68, lines 2–8).

11.   Whether the boat was in neutral or the engine was turned off, it could move with the waves. (*Id.* at 74, lines 17–23).

12.   In August 2021, Jonah Heyerholm joined Defendants, their daughters, and another friend for boating and wakeboarding. (*Id.* at 13, lines 17–21; 20, lines 17–19).

13.   Jonah had been on the boat on five or six prior occasions. (*Id.* at 17, lines 20–22).

14.   Jonah was wakeboarding. He was finished wakeboarding and wanted to be picked up. (*Id.* at 15, lines 5–7; 68, lines 12–19).

15.   The water was "pretty extremely choppy." (*Id.* at 21, lines 3-5; 68, line 21).

16.   The boat circled around Jonah to pick him up. (*Id.* at 15, lines 10–11; 68, lines 14–16).

17.   The boat stopped 20 to 30 feet in front of Jonah waiting for him to remove his wakeboard gear. (*Id.* at 68, lines 17–21).

18.   The boat began moving back toward Jonah. (*Id.* at 15, lines 17–23; 68, lines 21–25).

19.   Mr. Johnson felt the boat was drifting back near Jonah. (*Id.* at 37, lines 15–18; 68, lines 21–22).

20.   Mr. Johnson decided the best course of action was to move the boat further away from Jonah so that the choppy water did not push the hull onto him. (*Id.* at 77, lines 11–13).

21. When the boat began to drift toward Jonah, Mr. Johnson engaged the boat into forward to be further from Jonah but it went into reverse. (*Id.* at 37, lines 18-19; 68, lines 23-25).

22. He immediately shifted the boat into neutral and cut the engine. (*Id.* at 53, lines 3–6; 68, lines 23–25; 69, line 1).

23. Mr. Johnson was interviewed by the police within an hour to an hour and a half after the accident. (*Id.* at 37, lines 9–12).

24. Mr. Johnson's testimony was credible, and the record demonstrates it was consistent from the time of the police interview through the trial.

25. Jonah was struck by the propellor and sustained significant injuries.

26. Jonah was hospitalized for 42 days on medications and painkillers. (*Id.* at 17, lines 6–7).

27. Jonah's trial testimony was that he believed the boat was in gear and not drifting because it was moving toward him. (*Id.* at 15, lines 20–23).

28. Jonah agreed the boat could have been moving toward him because the water was choppy. (*Id.* at 21, lines 14–15).

29. Jonah assumed there was a transmission problem and that the boat was in gear when he was struck because he got into the propeller. (*Id.* at 25, lines 4–9).

30. Jonah testified at a deposition there was no reason for him to assume the boat was in gear. (*Id.* at 26, lines 16–22).

31. At trial he did not know or recall what changed his testimony. (*Id.* at 27, lines 2–6).

32.   Jonah does not remember an interview with a police officer about the accident (*Id. at* 19, lines 8–14).

33.   Jonah's testimony highlighted that he had no clear recollection of the accident after it happened.

34.   Jonah's testimony is inherently unreliable and demonstrated he had no clear recollection of events.

35.   Jonah's testimony about the accident was not credible.

36.   Mrs. Johnson noticed the boat was drifting "a little close to Jonah" as they were waiting for him to get his wakeboard off. (*Id.* at 82, lines 1–3).

37.   She warned Mr. Johnson about the drifting close to Jonah and she then jumped into the water to help Jonah. (*Id.* at 82, lines 5–6).

38.   She believed the boat had been placed in neutral. (*Id.* at 82, line 9).

39.   The Wisconsin Boater Safety Handbook[2] includes information on Wisconsin boating laws and includes safety tips and recommended practices.

40.   The Handbook says that most propeller strike injuries result from operator error. A tip for preventing a propeller strike is to make sure the engine is off so the propeller is not rotating when passengers are boarding or leaving the boat. (*Id.* at 39, lines 21–25; 40, lines 1–9).

41.   The tip is not a requirement under any statute or regulation.

---

[2] WIS. DEPT. OF NAT. RES., THE HANDBOOK OF WISCONSIN BOATING LAWS AND RESPONSIBILITIES (2022). Referred to at trial as the "Wisconsin Boater Safety Handbook."

42.  There is no evidence that the reasonable, prudent, and ordinary boater turns off the engine every time a skier or wakeboarder is in the water waiting to be picked up.

43.  There is no evidence the transmission was faulty.

44.  There is no evidence the engine or transmission required repair at the time of the accident.

45.  Plaintiffs were offered the opportunity to examine the boat but declined to do so. (*Id.* at 64, lines 15–25).

## LEGAL STANDARD

11 U.S.C. § 523(a)(6) states that a debtor may not discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The district court upheld this Court's finding that the Defendant's conduct was "willful," defined as "either if the 'debtor's motive was to inflict the injury, or the debtor's act was substantially certain to result in injury.'"[3] *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767 (7th Cir. 2013). The

---

[3] The Court decided Defendants' conduct satisfied the "willful" component because there had been issues with the boat's transmission that could cause the propellor to continue to spin and that issue could create a situation that was substantially certain to result in injury. And if a boat moves in reverse with the propellor spinning and strikes a person in the water, injury would be substantially certain. Upon review of the facts of the case, and with the benefit of having a complete copy of the trial transcript, the evidence shows that the issue with the engine was corrected in 2019. So, the Court is less sure the acts were willful in a strict sense. Yet, the district court has remanded this case with specific instructions to determine "maliciousness," so this Court is not empowered to revisit the question of "willfulness." *See United States v. Polland*, 56 F.3d 776, 777 (7th Cir. 1995) ("The mandate rule requires a lower court to adhere to the commands of a higher court on remand.") (citing *In re Continental Illinois Sec. Litigation*, 985 F.2d 867, 869 (7th Cir. 1993)); *United States v. Adams*, 746 F.3d 734, 744 (7th Cir. 2014) ("The law of the case doctrine is a corollary to the mandate rule and prohibits a lower court from reconsidering on remand an issue expressly or

7

district court remanded the case for this Court to determine whether the Defendants' conduct was "malicious," meaning "in conscious disregard of [his] duties or without just cause or excuse." *Id.* at 774–75; *In re Calvert*, 913 F.3d 697, 701 (7th Cir. 2019). A creditor doesn't need to prove both conscious disregard and lack of just cause or excuse. Either is sufficient.

Plaintiffs bear the burden of proof. They must prove maliciousness by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991).

## DISCUSSION

Plaintiffs argue that the Court's findings at trial which show the "willfulness" of Defendants' conduct meet the standard of an intentional tort. Next, they posit that if it was an intentional tort it must automatically be malicious. As noted by the district court, however, "those are two different analyses in this circuit, so one does not necessarily follow from the other." *Heyerholm v. Johnson*, 2024 U.S. Dist. LEXIS 170237, at *16.

In this Circuit, willfulness is judged objectively and requires that a debtor intend injury or that the act was substantially certain to result in injury. This is separate and distinct from "malicious." The court of appeals has more recently affirmed the *First Weber* standard, again using the disjunctive, stating that malicious means that the debtor "acted 'in conscious disregard of [his] duties or without just cause or excuse.'" *In re Calvert*, 913 F.3d at 701.

---

impliedly decided by a higher court absent certain circumstances.") (quoting *Polland*, 56 F.3d at 779).

To prevail, Plaintiffs must establish by a preponderance of the evidence that Defendants acted in conscious disregard of their duties, or that they acted without just cause or excuse.

1. This Court's Finding That Defendant's Conduct Was Willful Under the Code Doesn't Mandate a Finding of Maliciousness.

Plaintiffs first contend that the nature of the duty that Defendants consciously disregarded, or whether Defendants breached their duty of care, is no longer an issue. Plaintiffs suggest that since this Court found that the injury was willful, it meets the requirement of an intentional tort. Then after explaining the "willfulness" analysis from *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), Plaintiffs turn to *First Weber Grp., Inc. v. Horsfall*, 738 F.3d at 774, for the standard of "maliciousness." They confirm the district court's guidance that maliciousness requires a conscious disregard of duty, or lack of just cause or excuse.

Nonetheless, they infer that if an act is willful it must be a conscious disregard of duty and therefore malicious. Plaintiffs argue that since this Court found "willfulness," then Defendants necessarily committed an intentional tort under *Geiger*. And, citing *Taylor v. Snyder (In re Snyder)*, 542 B.R. 429, 443 (Bankr. N.D. Ill. 2015), and *Restatement (Second) of Torts* § 4 cmt. b (1965), Plaintiffs state that cases examining "duty" generally involve negligence, not intentional torts. So, Plaintiffs collapse *Horsfall*'s analysis to remove the requirement of finding "conscious disregard of duty" if the Court finds there

was "willfulness." The argument could be summarized as the following false

tautology:

> ➤ The injury was willful.

> ➤ A willful injury is an intentional tort.

> ➤ Intentional torts are malicious.

> ➤ Therefore, willful injuries are malicious.

The district court disposed of this interpretation. It explained that

"willfulness" and "maliciousness" "are two different analyses in this circuit, so

one does not necessarily follow from the other." This Court agrees. But even

aside from the fact that this Court must follow the district court's directive and

*Horsfall's* binding precedent and engage in the two-part analysis of finding

willfulness *and* maliciousness, Plaintiffs' argument is flawed.

The Supreme Court in *Geiger* explained that "the (a)(6) formulation

triggers in the lawyer's mind the category 'intentional torts,' as distinguished

from negligent or reckless torts. Intentional torts generally require that the

actor intend the *consequences* of an act, not simply the act itself." 523 U.S. at

61–62 (internal quotations omitted) (emphasis in original). The Supreme Court

didn't say that all intentional torts satisfy section 523(a)(6)'s requirement for

"willfulness." The Seventh Circuit later affirmed that "it does not hold that all

state-law intentional torts are 'willful' for purposes of section 523(a)(6)."

*Horsfall*, 738 F.3d at 774.

Plaintiffs misunderstand *Geiger* and *Horsfall*. They believe that even

though not all intentional torts are "willful" under the Code, all findings of

10

willfulness suffice to make the acts intentional torts. But that's not the case. Instead, considering this Circuit's holdings, an act can be found willful under the Code without sufficiently meeting the requirement for an intentional tort.

The district court explained that in the Seventh Circuit willfulness is judged by an objective standard, which is different from most other circuits. The objective standard seems to have originated in *Gerard v. Gerard*, 780 F.3d 806 (7th Cir. 2015). *Gerard* says that *Horsfall* introduced the objective standard. *Id.* at 811 (citing *Horsfall*, 738 F.3d at 774). In turn, *Horsfall* quotes *Bukowski v. Patel*, 266 B.R. 838, 844 (E.D. Wis. 2001). *Bukowski* didn't propose an objective standard but rather a subjective one which necessarily investigates intent. "[A] person acts willfully under § 523(a)(6) when he intends to injure or when he is substantially certain that his conduct will cause injury to the creditor." *Bukowski*, 266 B.R. at 844; *see also id.*, at 843 ("[*Geiger's*] reliance on the Restatement (Second) of Torts § 8A (1964) indicates that intent would include circumstances where *the debtor has subjective knowledge* that injury is substantially certain to result.") (citation omitted) (emphasis added).

Yet under Seventh Circuit guidance, an action can be willful if it is *objectively* substantially certain to result in injury, even if the debtor doesn't intend injury, or know or believe that injury is substantially certain. And that's the basis of the Court's "willfulness" decision here: Debtors committed an act that was objectively substantially certain to result in injury. A person in the water near a boat always is at risk of potential injury. This risk increases in

choppy water, when a boat drifts toward the person, or when there may be mechanical issues with the boat.

There was no evidence any injury was intended. And this Court made no findings as to whether Defendants knew or believed that injury was likely. That finding was upheld by the district court and is in line with *Horsfall* and *Gerard*. But despite *Geiger*'s teaching that section 523(a)(6) "triggers in the lawyer's mind the category 'intentional torts,'" this Court's ruling on willfulness wouldn't be sufficient to find an intentional tort occurred.

In Wisconsin, "[t]he intent with which tort liability is concerned is not necessarily a hostile intent or the desire to do harm," but "[t]o constitute an intentional tort, the actor must intend the consequences of his acts or believe they are substantially certain to follow." *Ewaskowitz v. Murdock*, 130 Wis. 2d 540, 393 N.W.2d 547 (Wis. Ct. App. 1986) (citing *Pachucki v. Republic Ins. Co.*, 89 Wis. 2d 703, 711, 278 N.W.2d 898, 902 (1979); W. Prosser, *Handbook of the Law of Torts* § 8 (4th ed. 1971); *Poston v. U. S. Fid. & Guarantee Co.*, 107 Wis. 2d 215, 223, 320 N.W.2d 9, 13 (Wis. Ct. App. 1982)). Thus, intent to injure, or a subjective belief that injury is substantially certain, is required. Neither was present in this Court's finding of willfulness. Therefore, and clearly, the question of "duty" is relevant because the Court must know what the Defendants allegedly consciously disregarded.

2. <u>Defendant's Conduct Was Not Malicious Under the Code.</u>

The district court's instructions on remand are for this Court to examine whether Defendants consciously disregarded their legal duties, or whether their

12

conduct was without just cause or excuse. Again, it's not necessary for Plaintiffs to show both; either is sufficient.

Plaintiffs primarily argue that Defendants' conduct was malicious because of a conscious disregard of duty. They first draw parallels to bankruptcy and state court decisions involving nondischargeability under section 523(a)(6) and tortious conduct. Then, Plaintiffs point to Mr. Johnson's testimony at trial and Defendants' pretrial statements that the boat occasionally remained in gear, and they highlight guidance and information from the Wisconsin Boater Safety Handbook.

The pretrial statement was not sworn testimony. It was not signed by the Defendants. The trial testimony of Mr. Johnson was credible. It was consistent with his prior statements. He explained that when he first bought the boat in 2019, the RPMs would run too high, the propellor would continue to spin, and the boat would "ratchet" in gear. He corrected this issue and adjusted the RPMs. After he adjusted the RPMs, the boat never again "ratcheted" in gear or remained in gear. Any issue related to the boat remaining in gear was resolved in 2019—well before Jonah's injury.

Defendants argue that Mr. Johnson acted with regard for his legal duties of care. They say trying to move the boat away from Jonah was an action to prevent harm. They argue it was reasonable to attempt to move the boat while it was drifting toward Jonah. Similarly, Defendants argue that Mr. Johnson had just cause and excuse because his actions were taken in good faith and meant to minimize risk.

13

The Court will first analyze whether Defendants consciously disregarded their duties and then examine whether they acted without just cause or excuse.

### A. Conscious Disregard of Duty

After arguing that the question of duty is not relevant, Plaintiffs later submit that Defendants had a duty to exercise ordinary care and a duty to refrain from willfully injuring others. Elsewhere, Plaintiffs suggest that it is ultimately the nature of a tortfeasor's conduct which determines the applicable duty.

Defendants generally agree, though they emphasize that the duty in this case is that of ordinary care. Under Wisconsin law, "each individual is held, at the very least, to a standard of ordinary care in all activities." *Rockweit v. Senecal*, 197 Wis. 2d 409, 419–20, 541 N.W.2d 742 (1995). In other words, it is the duty to exercise the care that would be exercised by a reasonable and prudent person under the same or similar circumstances to avoid or minimize the risk of harm to another. Dan B. Dobbs, et al., *The Law of Torts*, Part III, Subpart A, Ch. 12, Topic A, § 127 (2d ed. April 2024 Update).

The parties also agree that a court must look to the totality of the circumstances. Both parties cite this Court's decision in *Georgeson v. Rodriguez (In re Rodriguez)*, No. 17-00049, 2018 WL 671137 (Bankr. W.D. Wis. Jan 31, 2018), which explained

> In determining whether an actor behaved maliciously, courts will take into account the totality of the circumstances. *Vyshedsky v. Soliman (In re Soliman)*, 539 B.R. 692, 699 (Bankr. S.D.N.Y. 2015).

14

> "Malice is implied when 'anyone of reasonable intelligence knows that the act in question is contrary to commonly accepted duties in the ordinary relationships among people, and injurious to another.'" *Id.* (quoting *Navistar Fin. Corp. v. Stelluti (In re Stelluti)*, 167 B.R. 29, 33 (Bankr. S.D.N.Y. 1994), *aff'd*, 94 F.3d 84 (2d Cir. 1996)).

*Rodriguez*, 2018 WL 671137, at *2.

Plaintiffs rely on *Strenke v. Hogner*,[4] and *Wischer v. Mitsubishi Heavy Indus. Am., Inc.*,[5] to argue that Defendants' conduct showed a conscious disregard of duty. Each case is distinguishable and not persuasive in this case.

In *Strenke*, the Wisconsin Supreme Court found there was sufficient evidence to award punitive damages against a defendant, Hogner, who injured the plaintiff by driving while he was intoxicated. The defendant admitted that he drank between 16–18 twelve-ounce beers within a five-hour span before getting behind the wheel, which was corroborated by his 0.269% blood alcohol content at the time of the accident. 2005 WI 25, at ¶ 56–57. Defendant also admitted that he had four prior convictions for driving while intoxicated. *Id.* at ¶ 57. The court found that this conduct showed defendant "acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff," under former Wis. Stat. § 895.85(3) (now Wis. Stat. § 895.043).

Drunk driving under the facts in *Strenke* is a criminal offense. The statutes define the duty—no person may drive or operate a motor vehicle while under the influence of an intoxicant.[6] It is also unlawful to cause injury to

---

[4] 2005 WI 25, ¶ 19, 279 Wis. 2d 52, 694 N.W.2d 296.
[5] 2005 WI 26, ¶ 24, 279 Wis. 2d 4, 694 N.W.2d 320.
[6] Wis. Stat. § 346.63.

another person while operating a vehicle while intoxicated.[7] Finally, injury by intoxicated use of a vehicle is a felony.[8]

The duty in *Strenke* was unequivocal. The central issue in *Strenke* was whether causing injury by drunk driving is an intentional disregard of the rights of the plaintiff to justify punitive damages. The focus of that decision was on intentional disregard of the rights of another. Drinking 16 to 18 twelve-ounce containers of beer was deliberate.[9] Drunk driving was a disregard of safety and the rights of Strenke.[10] So the conduct was sufficiently aggravated to justify punitive damages.

*Wischer* involved a construction accident in which a crane collapsed in high wind, killing three workers. As in *Strenke,* the legal question centered around whether the defendant's conduct showed "an intentional disregard of the rights of the plaintiff," under former Wis. Stat. § 895.85(3) to support punitive damages. The Wisconsin Supreme Court concluded that it did.

The question was whether the evidence was sufficient to conclude that the conduct was substantially certain to result in the plaintiffs' rights being disregarded. 2005 WI 26, at ¶ 34. The court pointed to evidence that the defendant chose to operate the crane in high winds, no wind-speed calculations were made, the crane's load chart limitations were exceeded, and

---

[7] *Id.*

[8] Wis. Stat. § 940.25.

[9] 2005 WI 25, at ¶ 55.

[10] *Id.* at ¶ 56.

defendant knew operating the crane in high winds was dangerous. 2005 WI 26, at ¶ 57.

The *Wischer* court relied on an extensive record. There were 7,800 pages of trial transcripts, many witnesses, and hundreds of exhibits. *Id.* at ¶ 35. In particular, the court's opinion highlighted the testimony of a crane expert called by plaintiffs. The expert testified that the lift plan was completely inadequate and that failing to do wind-sail calculations (that is, the effect of the wind on the load) was a violation of industry standards, OSHA standards, and the load chart. *Id.* at ¶ 39.  The crane had a load chart and there were limits on the maximum safe use based on wind speed. *Id.* These standards were ignored. The expert called the actions of the defendant's site manager, who oversaw crane operations that day, "unconscionable." *Id.* at ¶ 44. The site manager had approved nine previous crane lifts on the project without factoring in wind speed, before the tenth resulted in tragedy. *Id.* The expert characterized the incident as though the site manager was playing "Russian Roulette." *Id.*

Here, Plaintiffs emphasize that Mr. Johnson admitted the boat occasionally remained in gear. But they ignore his testimony that the issue occurred only in the first year and before Mr. Johnson adjusted the RPMs. They also disregard the testimony of both Jonah and the Johnsons that the water conditions were "pretty extremely choppy" and that the boat could have and did drift toward Jonah because of the choppy conditions. Plaintiffs overlook the fact that there was a possibility of the boat striking Jonah as it drifted toward him. That possibility created a risk of injury.

Mr. Johnson testified that when he tried to move the boat away from
Jonah, the boat went into reverse. At trial, Plaintiffs pointed to variations in
Defendants' accounts. For example, after the incident, Mr. Johnson told Officer
Jepson that the boat "got stuck in reverse." (ECF No. 44 at 49, lines 3–9). The
full context of this statement was that "the boat started drifting back, and he
[Mr. Johnson] felt he needed to move the board forward, so he put the boat in
drive, and the boat got stuck in reverse." *Id.* At trial, Mr. Johnson simply
confirmed the quote from Officer Jepson's report.

Plaintiffs also pointed to the Defendants' answer in the state court
litigation. As Plaintiffs concede, the answer was signed by Plaintiffs' lawyer. At
trial, Mr. Johnson was asked whether the answer denied that the boat got
stuck in gear. (*Id.* at 50, lines 6–15). The answer says that the boat was drifting
so it was put in gear, but there was a lack of knowledge sufficient to form a
belief as to whether it got stuck in reverse gear, and that portion of the
allegation was denied. In the answer here, Defendants denied that the boat
would get stuck in reverse but alleged that it would occasionally remain in
gear. (*Id.* at 50, line 25; 51, lines 1–6; ECF No. 12 at 2). While in their discovery
responses Defendants stated that the transmission would "seem to slip a little
while shifting gears" and, for example, would drift slowly in neutral (ECF No.
44 at 53, lines 21–24; ECF No. 29, Ex. 10 at 12), this does not accurately or
fully portray the facts.

None of the direct testimony about these responses to prior discovery or
pleadings inquired when in time the transmission might have slipped or what

that meant. At any rate, when questioned in the combined direct and cross presented by the Johnsons' attorney, the answers became clear.

- The first season the idle was high. High RPMs put pressure on the propellor that would not allow shifting to fully take place. (ECF No. 44 at 60, lines 18–24).

- Mr. Johnson adjusted the RPMs so that the prop would fully disengage. (*Id.* at 71, lines 21–24).

- Adjusting the engine resolved the ratcheting in gear. (*Id.* at 62, lines 11–25).

- The boat never got stuck in a particular gear. (*Id.* at 60, line 7).

- At the time of the injury to Jonah, the boat "started to move in reverse, when [Mr. Johnson] shifted it in forward, [he] immediately shifted it back into neutral and cut the engine. So it never got stuck in gear." (*Id.,* lines 8–13).

Plaintiffs conclude that the only reasonable inference from this testimony is that there were continuing transmission issues, and that Defendants ignored the issues. Consequently, Plaintiffs say the boat transmission had transmission problems getting stuck in gear, this time in reverse, with disastrous results. But that's not what the testimony shows, nor is it what the Court at first found, or how the Court views the facts today.

This case isn't like *Strenke.* That defendant violated the criminal law of driving while intoxicated. He created a clear and direct danger by consuming

excessive alcohol and driving. The seriousness of driving while intoxicated

warrants its own exception to discharge, section 523(a)(9).

Here, no law prohibits Defendants' actions. There is simply the

aspirational safety tip that having the engine turned off and the propellor

stopped would guarantee that there would never be a propellor strike. There

was no evidence that turning the engine off when picking up a wakeboarder

was the usual, customary practice. There was no testimony that turning the

engine off is the ordinary care that boaters take.

And nothing in the record suggests the boat ever previously went into

reverse when the operator tried to shift it into forward. The incident that

occurred here was the result of an issue that the Defendants had not

encountered in three years of ownership and regular use. *See* ECF No. 44 at

122, lines 13–16 ("[T]he testimony does indicate that on that day in August of

2021 it was the first time the boat had ever gone into reverse without the boat

being placed into reverse."). After three seasons of use and dozens of outings, it

was reasonable for Mr. Johnson to assume that the boat would function as

intended. The "Russian Roulette" characterization Plaintiffs offer is unfitting.

Unlike *Wischer,* there were no experts, no industry standards, or

guidelines.[11] The *Wischer* plaintiffs definitively established the applicable

industry and OSHA standards. The plaintiffs also submitted evidence showing

the defendant was aware of the dangerous wind conditions. Defendant could

---

[11] 2005 WI 26, ¶ 35.

and should have performed wind-speed calculations and obeyed the crane's load chart limitations before operation. It was "unconscionable" for defendant not to. 2005 WI 26, at ¶ 44.

Here, the Wisconsin Boater Safety Handbook suggests that boat operators turn off the engine when passengers are boarding or leaving the boat. But it doesn't establish a duty, let alone a *conscious disregard* of duty if the engine is not turned off. No computational safeguards such as those in *Wischer* were available to Mr. Johnson in real time. He was forced to act by the windy, "pretty extremely choppy" conditions of the water. In such conditions, there is a reasonable risk of injury because a boat could be heaved by rough waves onto a swimmer, downed skier, or wakeboarder. And even though an engaged propeller undeniably creates a serious risk of injury, there's also a risk of injury created by windy conditions pushing the hull of a boat into an individual in the water.

The facts show that the Defendants' actions were "willful," because a spinning propellor on a boat moving in reverse bears an objectively substantially certain risk of injury to anyone in the water behind the boat. The Defendants did not intend the injury, nor did they have subjective knowledge that injury was substantially certain to occur. Defendants reasonably believed there was a risk of injury caused by the windy, "pretty extremely choppy" conditions, and the boat drifting toward Jonah in the water. After assessing this risk of injury, Mr. Johnson tried to move the boat away. In other words, he sought to protect Jonah by removing a risk of injury. He ultimately failed to

21

prevent harm. But his assessment of the situation and attempt to align his conduct with his duty showed an awareness of responsibility and a presence of mind to act. In other words, a conscious regard of duty.

### B. Lack of Just Cause or Excuse

Plaintiffs' arguments that *Horsfall* and *Kozlik*[12] show the Defendants acted without just cause or excuse are equally unpersuasive. To start, *Horsfall* and *Kozlik* both focused on whether the bankruptcy court should apply the doctrine of issue preclusion to a finding of maliciousness under the Code. Both cases had prior state court tort judgments. The federal courts deferred to findings of maliciousness by the state courts. In *Horsfall*, the Seventh Circuit concluded that the issue of "maliciousness" was decided by a state court judgment which found that the debtor, Horsfall, tortiously interfered with First Weber's exclusive right to sell property on behalf of a third-party client.

The court's opinion focused on whether the debtor acted without just cause or excuse, as noted by the district court. The Seventh Circuit reasoned that the state court's judgment required a finding that Horsfall was "not justified or privileged to interfere" with First Weber's contract rights. 738 F.3d at 775. "In order to reach this conclusion, the state court had to find that Horsfall's actions were not reasonable or taken in good faith." *Id.* Thus, the court held that both the bankruptcy and district courts erred in not applying issue preclusion to the question of "maliciousness" under section 523(a)(6).

---

[12] *Rathsack v. Kozlik (In re Kozlik)*, No. 12-2659, 2013 WL 28708, at *3 (Bankr. E.D. Wis. Jan. 2, 2013).

In *Kozlik*, the bankruptcy court ruled that a prior state court judgment conclusively decided the debtors acted willfully and maliciously under the Code. The state court judgment made thorough findings, based on

> overwhelming evidence produced by plaintiffs at trial which demonstrated, unequivocally, that plaintiffs, their guests and invitees were subjected to repeated and continual harassment including persons running towards the easement while plaintiffs used it, persons shaking fists at them and calling them profane names . . . this happened on a weekly basis. . . . The harassment further included placing objects in the easement, and damaging it at times.

*Kozlik*, 2013 WL 28708, at *2.

The state court specifically found that the debtors committed weekly acts "which *harassed and intimidated plaintiffs, and served no legitimate purpose whatsoever.*" *Id.* at *3 (emphasis in original). The bankruptcy court relied on this latter finding that the debtors had "no just cause or excuse" to conclude that issue preclusion should apply to the state court's findings on maliciousness. *Id.* at *3. In finding willfulness, the bankruptcy court relied on statements from the state court that the debtor was an "egregious offender," and that his harassment "constituted an *intentional* interference" with plaintiffs' use and enjoyment of an easement. *Id.* at *3 (emphasis in original).

Both *Horsfall* and *Kozlik* are distinguishable because they present clear examples of a debtor acting without just cause or excuse, supported by thorough state court findings. The debtor in *Horsfall* violated an exclusive right to sell contract by poaching business from the plaintiff. The debtor in *Kozlik* granted an easement to plaintiffs and then repeatedly harassed and intimidated them for using it. Neither case helps fully clarify the meaning of

23

"just cause or excuse." But *Horsfall* does justify its conclusion by explaining that the debtor's actions were "not reasonable or taken in good faith." 738 F.3d at 775.

In this case, testimony showed that the lake was "choppy" on the day of the accident, even "pretty extremely choppy." (ECF No. 44 at 21, line 5; 68, line 21). It's possible that the boat was even moving in reverse because the water was so choppy. (*Id.* at 21, lines 6–16). Mrs. Johnson told Mr. Johnson that the boat was too close to Jonah. (*Id. at* 82, lines 2-3). Mr. Johnson concluded "the best course of action at the time was to move the boat further away from Jonah so that the choppy water didn't push the hull onto him." (*Id.* at 77, lines 11–13). Mrs. Johnson jumped into the water to help Jonah. (*Id.* at 82, lines 5–6).

The facts show Defendants' reasonable assessment of the situation and good faith efforts to avoid harm. The windy, choppy conditions and the boat's proximity to Jonah created a risk of injury. Mrs. Johnson expressed her concern about the windy conditions by alerting Mr. Johnson that the boat was drifting too close to Jonah. Mr. Johnson was worried that the hull of the boat could be heaved onto Jonah and tried to prevent that from happening. His effort to move the boat served a "legitimate purpose," unlike the debtor in *Kozlik,* 2013 WL 28708, at *3. And without regard for her own safety, Mrs. Johnson leapt into the water to help Jonah. Thus, Defendants acted with just cause and excuse, evidenced by their reasonable concern about the choppy conditions, proximity to Jonah, and good faith actions to prevent injury.

And there are not any state court findings of fact to be considered in this

case. Issue preclusion does not apply as it did in *Horsfall* and *Kozlik.*

3. <u>No Requirement for Insurance</u>

Stretching to identify another right of Plaintiffs or duty of Defendants

that was ignored, Plaintiffs insist that Defendants' lack of insurance

contributes to a finding of maliciousness under the Code. But whether a debtor

maintains insurance is not a factor in nondischargeability determinations

under section 523(a)(6). As noted in *Geiger*, "Finally, [plaintiffs] maintain that,

as a policy matter, malpractice judgments should be excepted from discharge,

at least when the debtor acted recklessly or carried no malpractice insurance.

Congress, of course, may so decide. But unless and until Congress makes such

a decision, we must follow the current direction § 523(a)(6) provides." *Id.*, 523

U.S. at 64. Obtaining insurance may be the prudent course of action, but

Wisconsin has no requirement to insure a boat. *See* Wis. Stat. § 30.51(1). No

duty to insure has been established. Thus, any failure to insure does not

satisfy the requirements of a malicious action.

## CONCLUSION

Defendants didn't intend to harm Jonah Heyerholm although, as

sustained by the district court, their actions were "willful" under Code section

523(a)(6) because a boat in reverse approaching someone in the water is

objectively substantially certain to result in harm. On remand, this Court

concludes the Defendants did not consciously disregard their duties. The

Defendants did not act without just cause or excuse. Plaintiffs have failed to

establish by a preponderance of the evidence that Defendants acted in conscious disregard of their duties, or that they acted without just cause or excuse. The Defendants attempted the action a reasonable person would take in choppy water to avoid injury by moving the boat away from Jonah. Although Jonah was tragically injured, the facts do not establish that the Defendants consciously disregarded their duty of ordinary care, or that they acted without just cause or excuse. The actions of Defendants were not malicious within the meaning of section 523(a)(6).

This decision constitutes findings of fact and conclusions of law under Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order consistent with this decision will be entered.

Dated: March 4, 2025

BY THE COURT:

_____
Hon. Catherine J. Furay
U.S. Bankruptcy Judge